## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Nicole M. Catanese,             :
          Plaintiff,          :        CIVIL ACTION
                               :        No. 22-821
        v.                   :
                               :
David Martino, Martino Signs,    :
Inc., Nicholette Daniels,        :
Detective Ferdie G. Ingram, Jr.,   :
and the Borough of Yeadon,      :       January 13, 2025
          Defendants.      :

## <u>MEMORANDUM</u>

Plaintiff Nicole Catanese ("Catanese") brings suit against Detective Ferdie G. Ingram, Jr. ("Ingram") for (1) false arrest, false imprisonment, and malicious prosecution (under 42 U.S.C. § 1983 and the Fourth Amendment); and (2) malicious prosecution and intentional infliction of emotional distress (under Pennsylvania law).[1]  Catanese also seeks punitive damages under § 1983 and Pennsylvania law. Ingram moves for summary judgment as to all claims.  For the reasons that follow, the Court will (1) deny Ingram's motion as to Catanese's § 1983 claims and Pennsylvania malicious prosecution claim; (2) grant Ingram's motion as to

---

[1] Catanese also brings suit against David Martino ("Martino"), Martino Signs, Inc. ("Martino Signs"), and Nicholette Daniels ("Daniels") (collectively, "Martino Defendants"), alleging related violations of Pennsylvania law.  Because the Martino Defendants withdrew their motion for summary judgment on November 11, 2024, the Court limits its discussion to Catanese's claims against Ingram.  *See* Notice of Withdrawal, ECF No. 46.  Catanese's claims against the Borough of Yeadon were dismissed in June 2022.  *See* Order, ECF No. 14.

Catanese's intentional infliction of emotional distress claim; and (3) deny Ingram's motion as to Catanese's claim for punitive damages without prejudice to raise the issue at trial.

## I.    FACTUAL BACKGROUND

On June 9, 2020, the Delaware County Criminal Investigation Division ("CID") called the Yeadon Police Department to see if they had received a call from David Martino—president and chief operating officer of Martino Signs, Inc.— "about a potential fraud investigation."  Ingram's MSJ Ex. A, at 5, ECF No. 32-2 (hereinafter "Police Rep.").  Yeadon Police Officers Rebecca Rasanen and Thomas Murtha then went to Martino Signs to "make contact with Martino."  Police Rep. 5. Neither Rasanen nor Murtha took notes during their conversation, but rather, "interpreted what [Martino] said and wrote it . . . after the fact[.]"  *See* Catanese's Resp. to Martino Defs.' MSJ Ex. E, at 118:15-21, ECF No. 41-2 (hereinafter "Martino Dep. Tr.").  Murtha's subsequent write-up of their conversation is reprinted in full below:

> On 06/09/2020 at approximately 1622 hours, Yeadon Police received a phone call from Sergeant Hackett from Delaware County Criminal Investigations Division, who asked if the Yeadon Police received information from David Martino about a potential fraud investigation. Officer Murtha and I went to Martino Signs Incorporated at 453 Penn Street to make contact with Martino.  We made contact with David Martino, the owner of Martino Signs Incorporated, who stated that a former employer [sic] was stealing money from the company.  Martino said Nicole Cantanese [sic], former Project Manager, worked for the company for about two and a half years, and the suspected thefts started

about a year ago.  Martino said Cantanese [sic] would over price certain jobs to make more money.  Martino said Cantanese [sic] charged a job $8,900.00, when the job was initially estimated at $7,500.00.  Also, Martino stated he had two men to a truck to deliver products for the company and would charge approximately $1,200.00- $1,500.00 a day, and then Cantanese [sic] started to up the charge for the two men to about $5,000.00 a day.

Martino said that Cantanese [sic] would use her personal phone, and her personal social media accounts to contact Martino Signs Incorporated private contractors.  Martino said Cantanese [sic] would use these contacts for her personal agenda.  Martino stated that Cantanese [sic] stole over $100,000.00 from the company.  Martino had been in contact with Sergeant Hackett from Delaware County Criminal Investigations Division, who said Martino should contact Yeadon Police.  Martino said he had screen shots and further documentation proving Cantanese's [sic] guilt.  Martino is still going through all of his documents to get as much information and evidence as possible for police. Martino was told to email the screen shots to my Yeadon Police email for evidence. Martino would like to press charges and pursue this on the civil level as well.

Police Rep. 5.  Martino recalls their conversation differently.  *See generally* Martino

Dep. Tr. 90:13-94:19 *and* 117:10-119:11 (Martino's testimony regarding Murtha's

write-up of their conversation).  As Martino put it:  "I reported that I suspected she

was stealing . . . I explained multiple times what I suspected and they were very

confused about understanding it.  And repeatedly asked me how the process went

and what exactly I thought . . . ."  Martino Dep. Tr. 92:14-22.  More specifically,

Martino denies that he reported that Catanese "was stealing from the company";

rather, he claims he reported only that he "suspected" Catanese had stolen from the

company.  *Compare* Police Rep. 5 *with* Martino Dep. Tr. 92:14-15.  He likewise

denies that he said Catanese "stole over $100,000.00 from the company" and instead claims he told the officers that a certain project Catanese worked on was "$100,000 shy of where it need[ed] to be." *Compare* Police Rep. 5 *with* Martino Dep. Tr. 117:23-118:13.

On June 10, 2020, the case was assigned to Ferdie Ingram, a detective with the Yeadon Police Department. *See* Catanese's Resp. to Ingram's MSJ Ex. 1, at 18:8-19, ECF No. 39-1 (hereinafter "Ingram Dep. Tr."). That same day, Ingram (1) read Murtha's notes, but did not discuss them with Murtha or Rasanen; and (2) called Martino to set up a time to meet. *See* Ingram Dep. Tr. 18:13-19; Police Rep. 6.

On June 23, 2020, Ingram and another detective met with Martino to discuss the case. Police Rep. 6. During their meeting, Martino explained how he suspected Catanese had stolen money from his company, but he did not show or give them any records related to Catanese's suspected thefts. *Id.*; Ingram Dep. Tr. 22:19-25:12.[2]

On June 24, 2020, Ingram called Catanese. Their accounts of this call differ. Ingram and Catanese agree that (1) after "somewhat briefly" explaining "the reason for [his] call," Ingram asked to arrange a time for them to meet in person; (2)

---

[2] At some point—based on the record, it is unclear exactly when—Martino sent Ingram (or someone else at the Yeadon Police Department) a screenshot of Catanese's Facebook messages with one of Martino Sign's contractors. Martino Dep. Tr. 96:2-24; Ingram Dep. Tr. 78:8-20. Neither the screenshot nor a clear description of its contents were included in the record. When asked whether he was "able to identify any specific criminal conduct within the screenshots," Ingram replied "[n]o . . . I couldn't because I had no idea in terms of what the crime was other than what [Martino] was telling me[.]" Ingram Dep. Tr. 20:16-19.

Catanese said she was no longer living in Pennsylvania; and (3) Catanese refused to meet with him without a lawyer.  Police Rep. 6; *see also* Ingram's SUF 2 ¶ 4, ECF No. 32-1 (hereinafter "Ingram's SUF") (stating Ingram told Catanese he was calling "in reference to a blue collar theft" and that "she said she would not come without a lawyer"); Catanese's Resp. to Ingram's SUF ¶ 4, ECF No. 40 (hereinafter "Catanese's Resp. to Ingram's SUF") (admitting same).  Ingram and Catanese disagree, however, as to what else (if anything) was said on that call.  In his subsequent write-up of their call, Ingram wrote that Catanese "became upset and said that she was going to sue Martino for making a false report because of 'the kickbacks, that she received from the vendors.'"  Police Rep. 6; Ingram Dep. Tr. 22:19-25:12.  Catanese denies that she ever said this to Ingram.  *See* Catanese's Resp. to Ingram's SUF ¶ 3; Ingram's MSJ Ex. B, at 71:1-72:24, ECF No. 32-2 (hereinafter "Catanese Dep. Tr.").

On June 26, 2020, Martino gave Catanese's company computer to Ingram. Police Rep. 6.  Neither Ingram nor Martino could figure out how access the files on the computer, as it was password-protected; accordingly, on July 15, 2020, Ingram gave the computer to the CID for purposes of extracting and analyzing its files.  *See* Ingram Dep. Tr. 93:11-19; Martino Dep. Tr. 210:23-212:14; Police Rep. 6.

According to Ingram, "the investigation kind of took a stop" after he turned over Catanese's computer.  Ingram Dep. Tr. 22:14-15.  However, it picked back up

on July 21, 2020 when Martino emailed Ingram regarding "an anonymous call" he had received from a man named Greg Gallagher (who did not identify himself on the phone, but whose name and phone number showed up on Martino's caller ID). Ingram's MSJ Ex. E, ECF No. 32-2 (July 21, 2020 email from Martino to Ingram).[3] In that email, Martino wrote that Gallagher had told him Catanese was (1) "aware of what [was] going on"; (2) "boasting about all the money she got and just bought a boat and other high ticket items"; (3) living at Duck Neck Campground (a campsite in Chestertown, Maryland); and (4) doing meth. *Id.*[4]

On July 27, 2020, Ingram called Gallagher "in reference to the phone call that he made to [Martino]." Police Rep. 7; Ingram's SUF 4 ¶ 12. In the notes he took immediately after their call, Ingram wrote the following:

> Gallagher stated in the phone call that he knows [Catanese], and that she recently bought a boat and other high ticket items. Gallagher told Martino that [Catanese] is aware of the situation and that she is boasting and bragging about the money she stole. He also mentioned that she is doing meth, as they were supposed to be somewhat involved with doing it together. He lastly stated that she is now living out of state, in Chestertown Maryland.

Police Rep. 7. Shortly thereafter, Ingram confirmed that Catanese had a campsite at

---

[3] The record shows that this was the first and only time Martino and Gallagher spoke to each other. Martino Dep. Tr. 214:4-215:2. According to Catanese, Gallagher was her former friend. *See* Catanese Dep. Tr. 82:14-86:23. At her deposition, Catanese explained that "months before" she was let go from Martino Signs, she ended their friendship due to Gallagher's drug use. *Id.* at 83:5.
[4] Although Catanese does not and cannot dispute the existence of Martino's email regarding his call with Gallagher, she does dispute the truth of what Gallagher allegedly told Martino. Catanese's Resp. to Ingram's SUF ¶ 11.

Duck Neck Campground.  Ingram otherwise failed to corroborate—or even attempt to corroborate—the information provided by Gallagher.   Police Rep. 7; Ingram Dep. Tr. 29:15-31:5.

At some point thereafter, Ingram finished drafting his affidavit of probable cause and gave it to Detective Sergeant Houghton (Ingram's superior) for review and approval.  Ingram Dep. Tr. 112:19-113:25.  According to Ingram's undisputed testimony, Houghton reviewed and approved it without asking any questions.  *Id.* at 113:11-20.  At no point, however, did Ingram ask Martino to review it.  *See* Martino Dep. Tr. 163:19-20 ("I did not see this document.").

On August 4, 2020, Yeadon Police Department filed a criminal complaint—accompanied by Ingram's affidavit of probable cause prepared and signed by Ingram—charging Catanese with theft by unlawful taking or disposition, theft by deception, receiving stolen property, forgery, tampering with public records or information, and identity theft.   Ingram's MSJ Ex. D, at 1-5, ECF No. 32-2 (Complaint); *id.* at 6-7 (Affidavit) (hereinafter "Aff.").[5]   Ingram's affidavit is reprinted in full (with paragraph numbers added) below:

> 1.     On 6/09/202 at 4:22 PM Yeadon Police went to Martino Signs Incorporated at 453 Pano Street to investigate a fraud and theft act that

---

[5] More specifically, the nine-count complaint charged her with the following: (1) theft by unlawful taking or disposition (18 P.S. § 3921(a)); (2) theft by deception (18 P.S. § 3922(a)); (3) receiving stolen property (18 P.S. § 3925(a)); (4) two counts of forgery (one under 18 P.S. § 4101(a)(1) and another under 18 P.S. § (a)(2)); (5) tampering with records or identification (18 P.S. § 4104(a)); (6) identity theft (18 P.S. § 4120(a)); and (7) two counts of tampering with public records or information (one under 18 P.S. § 4911(a)(2) and another under 18 P.S. § 4911 (a)(3)).

had occurred. Upon arrival contact was made with the owner David Martino who stated that a former employer [sic] had stole [sic] money from the company. Martino said the defendant identified as Nicole Catanese, worked for the company for about two and a half years as a Property Manager. She was hired on 5/01/2017 and fired on 5/20/2020. Martino suspected that the thefts started close to a year ago. Martino said Catanese would over price certain jobs to make more money on the side. She would divide the difference between the actual price and the inflated price sometimes with certain clients and vendors. After going through the company records, Martino said Catanese over charged a job to the cost of $10,000.00, when the job was initially estimated at $7,500.00. She kept the difference[.]

2.      Martino stated that it was standard procedures for his company to have two men to a truck to deliver products, which would cost a standard charge between $1,200.00-$1,500.00 a day. Catanese started to up charge for the two men to about $5,000.00 a day, and again pocketing the difference[.]

3.      Martino said that Catanese would use her personal phone, and her personal social media accounts to contact Martino Signs Incorporated private contractors. Investigators were able to see through further investigation that Catanese was attempting to sell Martino Signs products from her face book account on 4/30/2020. Martino said Catanese would use these contacts for her personal agenda, and believes that certain vendors knew about the theft that she was committing and continued to do business with her anyway. Martino estimated that Catanese stole over 1 million dollars from the company at the time of this report. The company is still trying to compute the total amount, but estimates that it will be approximately 4-5 million dollars in loss.

4.      Martino caught the thefts after vendors stared [sic] calling up asking about when they were going to get paid. Martino then went to his newly hired company accountant, Nicki Daniels where he had discovered that Catanese was using her seniority, to have the new employee submit the fraudulent invoices. After the new employee started noticing the over charges, she alerted Martino who did some investigating and discovered the thefts.

5.      Martino said that he called Catanese into his office on 5/19/2020

to discuss the matter, when she had admitted to doing the over drafts. On 5/20/2020 Martino again brought Catanese into his office and explained to her that she was being fired. Prior to her departing the company property, Catanese had deleted all her emails that she had created using the company computer. Emails that Martino had discovered prior to her dismissal that detailed some transactions involving the thefts.

6. On 06/24/2020 Investigators reached out to Catanese who by her own admission said that she cant [sic] believe that this happening or that Dave is upset just because she was taking kick backs on the side to make extra money. Investigators asked Catanese if Dave knew about these actions and she said of course not.

On August 5, 2020—on the basis of the complaint and Ingram's affidavit—the magistrate issued a warrant for Catanese's arrest. *See* Police Rep. 7. On August 14, 2020, Catanese was arrested. *See id*. at 8. A few days later, she posted bail and was released. *See id*.

On June 3 or 4, 2021, the CID returned Catanese's computer to Ingram. *Compare id*. at 8 (supplemental police report entry dated June 3, 2021) *with* Ingram's MSJ Ex. G, at Yeadon0022 (digital forensics analysis dated June 4, 2021). However, for reasons unexplained, neither Ingram nor others at the District Attorney's office could access files or otherwise "acquire evidence from the computer." Ingram's SUF 5 ¶ 21; *see also* Ingram Dep. Tr. 74:12-25 (testimony regarding same). Accordingly, on July 13, 2021, the case was dismissed for lack of evidence. Ingram's SUF 6 ¶ 24; Police Rep. 10.

## II. LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Id*. In ruling on a motion for summary judgment, the court must draw all inferences from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After the moving party has met its initial burden, the nonmoving party must then "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id*. at 322. Both parties must support their factual positions by: "(A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The materials in the record that parties may rely on include "depositions, documents, electronically stored information, affidavits or declarations, stipulations

(including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).  In opposing a motion for summary judgment, the nonmoving party may not "rely merely upon bare assertions, conclusory allegations or suspicions." *Fireman's Ins. Co. of Newark, N.J. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982).

In essence, the inquiry at summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

## III.   DISCUSSION

### A.     § 1983 Claims (Count I)

Catanese brings § 1983 claims against Ingram for violation of her Fourth Amendment right to be free from false arrest, false imprisonment, and malicious prosecution.  To recover, she "must establish that a state actor engaged in conduct that deprived [her] of 'rights, privileges, or immunities' secured by the constitution or laws of the United States." *Wilson v. Russo*, 212 F.3d 781, 786 (3d Cir. 2000). The threshold question for each of her claims is whether Ingram had probable cause to arrest her. *See James v. City of Wilkes–Barre*, 700 F.3d 675, 683 (3d Cir. 2012) (lack of probable cause is an element of a Fourth Amendment false arrest claim); *Groman v. Twp. of Manalapan*, 47 F.3d 628, 636 (3d Cir. 1995) (same for Fourth

Amendment false imprisonment claim based on detention pursuant to an unlawful arrest); *Johnson v. Knorr*, 477 F.3d 75, 81-82 (3d Cir. 2007) (same for Fourth Amendment malicious prosecution claim). Probable cause to arrest "exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Orsatti v. New Jersey State Police*, 71 F.3d 480, 483 (3d Cir. 1995); *see also Wilson*, 212 F.3d at 789 ("Probable cause exists if there is a 'fair probability' that the person committed the crime at issue.") (quoting *Sherwood v. Mulvihill*, 112 F.3d 396, 401 (3d Cir. 1997)). While "[p]robable cause requires more than mere suspicion . . . it does not require that the officer have evidence sufficient to prove guilt beyond a reasonable doubt." *Orsatti*, 71 F.3d at 483.

Ingram moves for summary judgment on Catanese's Fourth Amendment claims on two grounds: (1) he arrested her "pursuant to a valid warrant" supported by probable cause; and (2) he is entitled to qualified immunity. Ingram's MSJ 14, 19-21.

Catanese opposes Ingram's motion. While she acknowledges that she was arrested pursuant to a warrant, she claims that the warrant was not supported by probable cause. Catanese's Resp. to Ingram's MSJ 8-9, ECF No. 39 (hereinafter "Catanese's Resp. to Ingram's MSJ"). She also posits that Ingram's affidavit

reflected a false and incomplete version of events, and a corrected affidavit would not otherwise establish probable cause. *See id*. at 9-10. Finally, Catanese contends that genuine disputes of material fact as to the existence of probable cause should preclude Ingram from invoking the doctrine of qualified immunity. *See id.* at 11-13.

The Court addresses in turn (1) whether the arrest warrant was supported by probable cause; (2) Catanese's claims regarding Ingram's affidavit; and (3) whether Ingram is entitled to qualified immunity.

### 1.    The arrest warrant

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation . . ." U.S. Const. amend. IV. In deciding whether to issue an arrest warrant, a magistrate must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability" that the suspect committed the crimes in question. *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

When faced with a challenge to a magistrate's probable cause determination, a reviewing court examines only "the facts that were before the magistrate judge"— namely, the four corners of the affidavit—to ensure "that the magistrate had a

substantial basis for concluding that probable cause existed."[6]  *United States v. Jones*, 994 F.2d 1051, 1055 (3d Cir. 1993) (internal citations omitted).  Furthermore, where an arrest is made on more than one charge, "probable cause need only exist as to any offense that could be charged under the circumstances."  *Barna v. City of Perth Amboy*, 42 F.3d 809, 819 (3d Cir. 1994).

Catanese argues that Ingram's affidavit "contains no facts" to suggest that she committed any of the nine crimes she was charged with.  Catanese's Resp. to Ingram's MSJ 9.  The Court disagrees.  Ingram's affidavit furnished a substantial basis for the magistrate to conclude that probable cause existed for at least one of the crimes at issue: theft by unlawful taking or disposition under 18 P.S. § 3921(a), which occurs when a person "unlawfully takes, or exercises unlawful control over, movable property of another with an intent to deprive him thereof."  *See also Commonwealth v. Dombrauskas*, 418 A.2d 493, 496-97 (Pa. Super. 1980) ("To be guilty of theft under this definition, the actor's intention or conscious object must be to take unlawfully the property of another for the purpose of depriving the other of his or her property.").  Ingram's affidavit sets forth the following, in relevant part:

---

[6] The Court thus may not consider "the information from Gallagher known to Ingram" or whether that information "further buttressed probable cause" because Ingram, for reasons unexplained, did not include this information in his affidavit.  Ingram's MSJ 17; *see also Johnson v. United States*, 333 U.S. 10, 13-14 (1948) ("The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence.  Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.").

(1) on June 9, 2020, Yeadon Police went to Martino Signs "to investigate a fraud and theft act that had occurred"; (2) "[a]fter going through company records," Martino said that he had been able to determine that Catanese had "overcharged jobs" and pocketed the proceeds; (3) Catanese had "us[ed] her seniority" to "submit the fraudulent invoices"; (4) Catanese confessed to investigators that she had been "taking kick backs on the side to make extra money"; and (5) when asked by investigators "if Martino knew about these actions," Catanese said "of course not." Aff. ¶¶ 1-3, 5-6. Based on this information in the affidavit, the magistrate had substantial reason to believe that Catanese had unlawfully taken the moveable property of another—namely, extra money she had obtained by submitting fraudulent invoices and through kickbacks—and did so intending to keep it for herself.

The Court thus concludes that Ingram's affidavit gave the magistrate a substantial basis to conclude that probable cause existed for Catanese's arrest.

### 2.    Ingram's affidavit

In light of the above, the only way Catanese can succeed on her Fourth Amendment claims is if she proffers evidence that Ingram knowingly or recklessly disregarded the truth in his affidavit and that an affidavit based on what Ingram should have told the judge would have lacked probable cause. *Wilson*, 212 F.3d at 786. More specifically, she must show—by a preponderance of the evidence—that

(1) Ingram "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that created a falsehood in applying for the warrant"; and (2) those assertions or omissions were "material, or necessary, to the finding of probable cause." *Id.* at 786-87.

> **i. Whether Ingram knowingly, or with a reckless disregard for the truth, made false statements or omissions in the affidavit**

The Court starts by determining whether a reasonable jury could find that Ingram made assertions or omissions that he "knew were false, or would have known were false except for his reckless disregard for the truth." *Id.* at 787 (cleaned up). Because the concept of "reckless disregard for the truth means different things when dealing with omissions and assertions[,]" the Court briefly addresses each in turn. *Id.*

Omissions are made with reckless disregard for the truth when an officer withholds facts that "any reasonable person would have known . . . a judge would wish to know." *Id.* at 788 (quoting *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993)). As the Court of Appeals for the Third Circuit explained in *Dempsey v. Bucknell University*, "an officer must have knowledge of the information alleged to have been recklessly omitted" and "the information must be relevant to the existence of probable cause," meaning "a reasonable person would know that it *could* affect the [magistrate's] probable cause determination[.]" 834 F.3d 457, 471

(3d Cir. 2016) (emphasis in original).

Assertions are made with reckless disregard for the truth "when viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *Wilson*, 212 F.3d at 788 (quoting *United States v. Clapp*, 46 F.3d 795, 801 n.6 (8th Cir. 1995)). "Unlike omissions, assertions can be made with reckless disregard for the truth even if they involve minor details." *Wilson*, 212 F.3d at 788; *see also Andrews v. Scuilli*, 853 F.3d 690, 698 (3d Cir. 2017) ("Misleading assertions can relate to even 'minor details' . . ."). Also unlike omissions, "recklessness is measured not by the relevance of the information," but rather, evidence demonstrating the officer's "willingness to affirmatively distort truth." *Wilson*, 212 F.3d at 788.

With these precepts in mind, and reading the record in a light most favorable to Catanese, the Court concludes that a reasonable jury could find that Ingram made a number of reckless omissions and assertions in his affidavit.

First, Ingram starts the affidavit by stating that on June 9, 2020, "Yeadon Police went to Martino Signs . . . to investigate a fraud and theft act *that had occurred*." Aff. ¶ 1 (emphasis added). By contrast, Murtha's notes from that day, which Ingram admits to having reviewed before filing the affidavit, tell a different and far less definitive story: "Yeadon Police received a phone call from Sergeant

Hackett from Delaware County Criminal Investigations Division, who asked if Yeadon Police received a call from David Martino about a *potential* fraud investigation." Police Rep. 5 (emphasis added). The information Ingram omitted— that the June 9 visit to Martino Signs was prompted by a call from the CID regarding "a potential fraud investigation" as opposed to "a fraud and theft act that had occurred"—is unquestionably relevant to the existence of probable cause and thus should have been included in the affidavit. *Compare* Police Rep. 5 *with* Aff. ¶ 1.

Second, Ingram asserts that "Martino . . . stated that a former employe[e] had stole[n] money from the company." This statement is consistent with Murtha's notes; however, it is contradicted by Martino's deposition testimony that he only ever "reported that [he] *suspected* she was stealing" to Murtha, Rasanen, or (most importantly) Ingram. Martino Dep. Tr. 92:14-15 (emphasis added); *see also id.* at 92:17-19 ("I explained multiple times what I suspected and they were very confused about understanding it."), 94:5-6 (testifying that Officer Murtha's notes were "incorrect"), 149:2-14 (testifying that "the wording" Ingram used was "incorrect . . . I said I suspected that she stole money."). The same can be said regarding a number of Ingram's statements in the affidavit about what Martino allegedly "said": they suggest by omission that Martino definitively knew that Catanese committed the thefts in question *and* had concrete evidence detailing how and when she did. *See* Aff. ¶ 1 ("Martino said Catanese would over price certain jobs to make more money

on the side. She would divide the difference between the actual price and the inflated price sometimes with certain clients and vendors."), *id.* ("After going through the company records, Martino said Catanese over charged a job to the cost of $10,000.00, when the job was initially estimated at $7,500.00. She kept the difference."), ¶ 2 (" . . . Martino stated that . . . Catanese started to up charge for the two men to about $5,000.00 a day, and again pocketing the difference."), ¶ 3 ("Martino said . . . certain vendors knew about the theft she was committing and continued to business with her anyway."), ¶ 4 ("Martino caught the thefts . . ."), *id.* (Martino "did some investigating and discovered the thefts."). Given that Ingram wrote the affidavit after having spoken to Martino on multiple occasions, a reasonable jury could find facts that lead them to conclude that Ingram knew that Martino's suspicions about Catanese were just that: suspicions. Because any reasonable person would know that a judge would want to know that Martino only ever "suspected" that Catanese had committed the acts in question, Ingram may have recklessly omitted this information from the affidavit.

Third, Ingram's assertions regarding Martino's estimated losses—that "Martino estimated that Catanese stole over 1 million dollars from the company at the time of this report" and "[t]he company is still trying to compute the total amount, but estimates that it will be approximately 4-5 million dollars in loss"—are also contradicted by Martino's testimony. Aff. ¶ 3. As to the first, Martino testified that

he told Ingram that Catanese was "working on an account that ha[d] a million dollars in receivables"—not that she had stolen over a million dollars from the company. Martino Dep. Tr. 158:6-162:3.  As to the second, Martino testified that he told Ingram he estimated that Martino Signs did 5 million dollars total in business between 2017 and 2020—not, as Ingram averred, that Catanese stole that amount. *See id.* at 162:23-163:18.  Indeed, Martino said it was "impossible" for Catanese to have stolen $4-5 million dollars and that he "would have never signed off" on these estimates had he reviewed the affidavit before it was submitted to the magistrate. *Id.* at 162:3, 162:18.  Moreover, considering that Murtha's notes state that Martino initially estimated a loss of $100,000, a reasonable jury could find that Ingram "had obvious reasons to doubt the accuracy" of the exponentially higher losses he ultimately reported in the affidavit—especially because he never saw documents corroborating them. *Wilson*, 212 F.3d at 788.

Fourth, Ingram asserts that Martino "went to his newly hired company accountant, Nicki Daniels, where he had discovered that Catanese was using her seniority to submit the fraudulent invoices." Aff. ¶ 4.  However, when Martino was asked whether Ingram's assertion was correct, Martino said no.  He clarified that he said Catanese "was *trying* to get [Daniels] to push invoices in that were more than we needed to pay" but "they didn't go through."  Martino Dep. Tr. 170:6-16 (emphasis added).  Ingram's choice of words ("Catanese was using her seniority to

submit *the fraudulent* invoices") suggests that Martino had identified concrete evidence of Catanese's theft.  Aff. ¶ 4.  By contrast, Martino's explanation (Catanese tried to submit invoices "that were more than we needed to pay" and "didn't go through") is far less inculpatory.  Martino Dep. Tr. 170:6-16.  A reasonable jury could thus infer that Ingram affirmatively distorted what Martino told him in service of solidifying the charges against Catanese.

Fifth, Ingram asserts that, after Catanese was fired, she "deleted all her emails that she had created using [her] company computer.  Emails that Martino had discovered prior to her dismissal that detailed some transactions involving the thefts."  Aff. ¶ 5.  At his deposition, Martino confirmed that he told Ingram that Catanese deleted all of her emails; however, he denied that he ever "discovered" (or ever told Ingram that he discovered) any emails "involving the thefts" before he fired Catanese.  Martino Dep. Tr. 177:16-179:23.  Weighing this conflicting evidence in the light most favorable to Catanese, a reasonable jury could find that Ingram "willingly and affirmatively distorted" what Martino told him to bolster the case against Catanese.  *Wilson*, 212 F.3d at 788 (cleaned up).

Sixth, Ingram's assertion that on May 19, 2020, Martino and Catanese "discussed the matter" and Catanese "admitted to doing the over drafts" likewise conflicts with Martino's testimony.  Aff. ¶ 5.  While Martino confirmed that he and Catanese "discussed the matter" on May 19, he denied that Catanese ever "admitted"

to anything.  Martino Dep. Tr. 175:23-177:12.  Considered alongside Martino's testimony that he only told Ingram that he "suspected" Catanese had stolen from him, Ingram had "obvious reasons to doubt" that Catanese made any such admission of wrongdoing to Martino.  *Wilson*, 212 F.3d at 788.  Viewing the evidence in the light most favorable to Catanese, a reasonable jury could find facts that lead them to conclude that Ingram's assertion was made with reckless disregard for the truth.

Finally, Ingram's description of his June 23, 2020 conversation with Catanese in the affidavit is far more detailed (and inculpatory) than his contemporaneous write up of their conversation.  In the affidavit, Ingram writes: "Investigators reached out to Catanese who by her own admission said that she cant [sic] believe that this happening or that Dave is upset just because she was taking kick backs on the side to make extra money.  Investigators asked Catanese if Dave knew about these actions and she said of course not."  Aff. ¶ 6.  In his notes, however, Ingram wrote only that Catanese "said she was going to sue Martino's for making a false report to us, because of 'the kick backs, that she received from his vendors.'"  Police Rep. 6.  While the version presented in Ingram's affidavit reads like a confession, the version presented in Ingram's notes reads like a refutation.  Evaluating these conflicting accounts in the light most favorable to Catanese, a reasonable jury could determine that Ingram's description of their conversation was made with reckless disregard for the truth.

### ii.    Materiality

Next, the Court must "excise the offending inaccuracies and insert the facts recklessly omitted, and then determine whether or not the 'corrected' warrant affidavit would establish probable cause." *Wilson*, 212 F.3d at 789; *Dempsey*, 834 at 470 ("[W]hen a court determines that information was asserted or omitted in an affidavit of probable cause with at least reckless disregard for the truth, it must perform a word-by-word reconstruction of the affidavit.").  If it would, then Ingram's assertions and omissions were not material and his motion for summary judgment on Catanese's Fourth Amendment claims must be granted.  *See id*. Ingram's corrected affidavit would read as follows:[7]

> **1.** On 6/09/2020 at 4:22 PM Yeadon Police **[received a phone call from Sergeant Hackett from Delaware County Criminal Investigations Division, who asked if Yeadon Police received information from David Martino about a potential fraud investigation.  Yeadon Police then]** went to Martino Signs Incorporated at 453 Pano Street to investigate ~~a fraud and theft act that had occurred~~.  Upon arrival contact was made with the owner David Martino who stated that **[he suspected]** a former employer [sic] had stole money from the company.  Martino said the defendant identified as Nicole Catanese, worked for the company for about two

---

[7] Recklessly omitted information has been added in bold and bracketed text; reckless assertions have been excised as indicated in bold and struck-through text.  To the extent the Court's reconstruction includes disputed facts, it uses the facts most favorable to Catanese. *See Dempsey*, 834 F.3d at 468 (in evaluating probable cause at the summary judgment stage, "we view all such facts [favorable and unfavorable to the nonmovant] and assess whether any reasonable jury could conclude that those facts, considered in their totality *in the light most favorable to the nonmoving party*, did not demonstrate a 'fair probability' that a crime occurred.") (emphasis added); *see also Saintil v. Borough of Carteret*, No. 22-2898, 2024 WL 3565308, at *9-10 (3d Cir. July 29, 2024) (using disputed facts most favorable to nonmovant to reconstruct affidavit).

and a half years as a Property Manager.  She was hired on 5/01/2017 and fired on 5/20/2020.  Martino suspected that the thefts started close to a year ago.  Martino said **[that he suspected]** Catanese would over price certain jobs to make money on the side.  **[He suspected she]** ~~She~~ would divide the difference between the actual price and the inflated price sometimes with certain clients and vendors.  After going through the company records, Martino said **[he suspected]** Catanese over charged a job to the cost of $10,000.00, when the job was initially estimated at $7,500.00.  **[He suspected she]** ~~She~~ kept the difference[.]

**2.**   Martino stated that it was standard procedures for his company to have two men to a truck to deliver products, which would cost a standard charge between $1,200.00-$1,500.00 a day.  **[He suspected that]** Catanese started to up charge for the two men to about $5,000.00 a day, and again pocketing the difference[.]

**3.**   Martino said that Catanese would use her personal phone, and her personal social media accounts to contact Martino Signs Incorporated private contractors.  Investigators were able to see through further investigation that Catanese was attempting to sell Martino Signs products from her face book account on 4/30/2020.  Martino said Catanese would use these contacts for her personal agenda, and believes that certain vendors knew about the theft that **[he suspected]** she was committing and continued to do business with her anyway.  ~~Martino estimated that Catanese stole over 1 million dollars from the company at the time of this report.  The company is still trying to compute the total amount, but estimates that it will be approximately 4-5 million dollars in loss.~~

**4.**   Martino ~~caught~~ **[started suspecting]** the thefts after vendors star[t]ed calling up asking about when they were going to get paid.  Martino then went to his newly hired company accountant, Nicki Daniels where he had discovered that Catanese was **[trying to use]** ~~using~~ her seniority, to have the new employee submit ~~the fraudulent~~ **[inflated]** invoices.  After the new employee started noticing the over charges, she alerted Martino who did some investigating ~~and discovered the thefts~~.

5.  Martino said that he called Catanese into his office on 5/19/2020 to discuss the matter ~~when she had admitted to doing the over drafts~~. On 5/20/2020 Martino again brought Catanese into his office and explained to her that she was being fired.  Prior to her departing the company property, Catanese had deleted all her emails that she had created using the company computer.  **~~Emails that Martino had discovered prior to her dismissal that detailed some transactions involving the thefts.~~**

6.  On 06/24/2020 Investigators reached out to Catanese who **~~by her own admission~~** said ~~that she can['[t believe that this happening or that Dave is upset just because she was taking kick backs on the side to make extra money.  Investigators asked Catanese if Dave knew about these actions and she said of course not.~~ [she was going to sue Martino's for making a false report to us, because of "the kick backs, that she received from his vendors."]

Drawing all inferences in favor of Catanese, a reasonable jury could find that the corrected affidavit would not support probable cause for Catanese's arrest. While probable cause to arrest does not require "evidence sufficient to prove guilt beyond a reasonable doubt," it *does* require evidence beyond "mere suspicion." *Orsatti*, 71 F.3d at 482-83.  Here, a reasonable jury could find the following: (1) Martino suspected that Catanese had stolen from him by overpricing certain jobs and keeping the proceeds for herself; (2) investigators saw that Catanese attempted to sell Martino Signs products from her Facebook account; (3) Martino said that Catanese had tried and failed to submit inflated invoices; (4) Martino said Catanese deleted all of her emails from her company computer after she was fired; and (5) Catanese told investigators she was going to sue Martino for making a false report about her.  These facts fall far short of establishing a fair probability that Catanese

committed *any* of the nine crimes she was alleged to have committed; indeed, a reasonable jury could conclude that they suggest nothing more than mere suspicion.

In conclusion, genuine disputes of material fact exist as to (1) whether Ingram omitted or asserted information in his affidavit with at least a reckless disregard for the truth; and (2) whether his omissions and assertions were material to the finding of probable cause. Viewing the record and drawing all inferences in favor of Catanese, a reasonable jury could certainly find that Ingram made reckless omissions and assertions, and likewise, a corrected affidavit would fail to establish probable cause for Catanese's arrest. However, exactly which facts should be found and which inferences should be drawn are determinations best made by a jury. *See Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 788 (3d Cir. 2000) ("Generally, the question of probable cause in a section 1983 damage suit is one for the jury. This is particularly true where the probable cause determination rests on credibility conflicts.") (cleaned up). For these reasons, the Court must therefore deny Ingram's motion for summary judgment on Catanese's § 1983 claims.

### 3.    Qualified immunity

Finally, the Court addresses Ingram's qualified immunity defense. To determine whether a government official is entitled to qualified immunity, a court must consider two questions: (1) whether the facts shown by plaintiff make out a violation of a constitutional right; and (2) whether the right at issue was "clearly

established" at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (internal citation omitted). However, "the existence of disputed, historical facts material to the objective reasonableness of an officer's conduct will give rise to a jury issue." *Curley v. Klem,* 298 F.3d 271, 278 (3d Cir. 2002).

Ingram argues that, even if his conduct may have violated Catanese's Fourth Amendment rights, he is nonetheless entitled to summary judgment under the doctrine of qualified immunity. In doing so, he appears to contemplate that the answer to the first qualified immunity question could be yes. Rightly so. As discussed above, and taking the facts most favorable to Catanese, a reasonable jury could conclude that Ingram arrested Catanese without probable cause, thereby violating her Fourth Amendment rights.

As for the second question, "there is no question that . . . the right to be free from arrest except on probable cause was clearly established" at the time of Catanese's arrest. *Andrews*, 853 F.3d at 705 (cleaned up). Likewise, "the right to be free from prosecutions on criminal charges that lack probable cause was also known and clearly established" when Ingram prepared his affidavit. *Id.* (citing *Donahue v. Gavin*, 280 F.3d 371, 380 (3d Cir. 2002)). Notwithstanding the fact that

these rights were grounded in well-settled law, whether Ingram's conduct was objectively reasonable hinges on the disputed facts discussed above. These are facts that must be decided by a jury and likewise preclude Ingram from invoking a qualified immunity defense. The Court will therefore deny Ingram's motion for summary judgment on the question of qualified immunity.

### B.    State Law Claims

Catanese also brings two claims against Ingram under Pennsylvania law: malicious prosecution and intentional infliction of emotional distress ("IIED"). Ingram moves for summary judgment on both. For the reasons that follow, the Court will deny Ingram's motion as to Catanese's malicious prosecution and grant it as to her IIED claim.

### 1.    Malicious Prosecution (Count II)

Under Pennsylvania law, "[a] cause of action for malicious prosecution has three elements. The defendant must have instituted proceedings against the plaintiff (1) without probable cause, (2) with malice, and (3) the proceedings must have terminated in favor of the plaintiff." *Kelley v. Gen. Teamsters, Chauffeurs & Helpers, Loc. Union 249*, 544 A.2d 940, 941 (Pa. 1988); *see also id.* ("Malice may be inferred from a lack of probable cause.").

As discussed at length above, there are genuine disputes of material fact as to the existence of probable cause. The Court will therefore deny Ingram's motion for

summary judgment on Catanese's malicious prosecution claim.

## 2.    Intentional Infliction of Emotional Distress (Count III)

To establish an IIED claim under Pennsylvania law, a plaintiff must show that defendant's conduct was (1) extreme and outrageous; (2) intentional or reckless; and (3) caused severe emotional distress. *Wisniewski v. Johns-Manville Corp.*, 812 F.2d 81, 85 (3d Cir. 1987). The third element requires "expert medical confirmation" of the "nature and extent" of their alleged emotional distress. *Kazatsky v. King David Memorial Park, Inc.,* 527 A.2d 988, 995 (Pa. 1987); *see also Bolden v. Se. Pennsylvania Transp. Auth.*, 21 F.3d 29, 35 (3d Cir. 1994) ("Under Pennsylvania law, expert medical evidence must be presented before a plaintiff can recover for intentional infliction of emotional distress."); *Paves v. Corson*, 765 A.2d 1128, 1134 (Pa. Super. Ct. 2000) ("[A] plaintiff . . . must prove through expert medical testimony that she actually suffered the claimed distress."), *rev'd on other grounds*, 801 A.2d 546 (Pa. 2002).

The Court concludes that Ingram is entitled to summary judgment on Catanese's IIED claim because Catanese has not adduced expert medical confirmation of her alleged emotional distress. Ingram's MSJ 10. Although Catanese claims she suffered and sought treatment for a "loss of appetite, inability to sleep, and severe mental anguish," she presents no expert medical confirmation of her alleged distress. Catanese's Resp. to Ingram's MSJ 15; *see also* Catanese's

Resp. to Martino Defs.' MSJ Ex. H, at 6-7, ECF No. 41-2 (Catanese's answers to Ingram's interrogatories, detailing her distress and claiming she received treatment from Drs. McCabe and Rowan). Her "unsubstantiated averments," by themselves, are not enough. *Kazatsky*, 527 A.2d at 992 (affirming dismissal of IIED claim where plaintiffs "presented no expert testimony, indeed no evidence at all except their own unsubstantiated averments, concerning their alleged injuries."). Absent expert medical corroboration, Catanese's IIED claim necessarily fails. *See Gray v. Huntzinger*, 147 A.3d 924, 929 (Pa. Super. Ct. 2016) (holding plaintiff was not entitled to recover for IIED because he failed to present expert medical testimony confirming alleged emotional distress); *see also Warner v. Montgomery Twp.*, No. CIV.A. 01-3309, 2002 WL 1623774, at *10 (E.D. Pa. July 22, 2002) (granting defendants summary judgment on IIED claim because plaintiff "[did] not attach[] any affidavits or medical reports showing that he has competent medical evidence revealing severe emotional distress."). The Court will thus grant Ingram's motion for summary judgment as to Catanese's IIED claim.

### C.    Punitive Damages Under § 1983 and State Law (Count X)

The Court will deny Ingram's motion for summary judgment as to Catanese's claim for punitive damages without prejudice to raise the issue at trial.

## IV.    CONCLUSION

For the foregoing reasons, the Court will deny in part and grant in part

Ingram's motion for summary judgment as follows:

- Ingram's Motion for Summary Judgment as to Catanese's § 1983 claims for Fourth Amendment false arrest, false imprisonment, and malicious prosecution will be denied.

- Ingram's Motion for Summary Judgment as to Catanese's state law claim for malicious prosecution will be denied.

- Ingram's Motion for Summary Judgment as to Catanese's state law claim for intentional infliction of emotional distress will be granted.

- Ingram's Motion for Summary Judgment as to Catanese's claim for punitive damages will be denied without prejudice to raise the issue at trial.


      s/ANITA B. BRODY, J._____
      ANITA B. BRODY, J.